**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JOHN DOE, a minor, by and through his father and next best friend, BILL DOE, ) ) ) | |
| Plaintiff, ) ) ) | CASE NO. 02-C-7680 |
| v. ) ) ) | Judge Robert M. Dow, Jr. |
| V. of T., a municipal corporation, J.K., Individually and as an agent of V. of T., and V. of T. BOARD OF FIRE AND POLICE COMMISSIONERS, ) ) ) ) ) ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

In November 2001, then sixteen-year-old John Doe ("Plaintiff") participated in the Village of Thornton's ("Village") fire cadet training program, an extracurricular program offered to minors who are between the ages of fourteen and eighteen. The program was run by J.K., the Village's fire chief at the time. In December 2001, J.K. asked Plaintiff to accompany him to pick up an ambulance from another fire station. However, after J.K. and Plaintiff left the Village fire station, J.K. drove Plaintiff to J.K.'s house, where he sexually assaulted Plaintiff. On July 18, 2002, J.K. was arrested, and on July 21, 2002, J.K. gave written statements to the police in which he admitted to having a sexual relationship with Plaintiff while he was fire chief and Plaintiff was a cadet and also admitted to having a sexual relationship with another cadet while serving as fire chief.

At the outset, it is important to note what is and is not before the Court at this time. Plaintiff has sued J.K. alleging five state law causes of action – assault, battery, reckless infliction of emotional distress, invasion of privacy, and negligence. In his third amended

complaint, he also alleges two causes of action against the Village and the Village's Board of Fire and Police Commissioners ("Fire and Police Board") for a constitutional deprivation pursuant to 42 U.S.C. § 1983 and for municipal and supervisory liability under *Monell*, and one cause of action against the Village, Fire and Police Board, J.K., and the Village president for civil conspiracy under Section 1983. The pending motion for summary judgment [97], filed by the Village and the Fire and Police Board, targets Counts VI (42 U.S.C. § 1983), VII (*Monell* claim), and VIII (Section 1983 conspiracy claim) of Plaintiff's operative third amended complaint. The state law claims against the individual Defendant, J.K., set forth in Counts I through V of the operative complaint, are not at issue. As explained in greater detail below, nor is any Section 1983 claim against J.K. in his individual capacity, because no such claim is fairly presented on the current complaint. For the following reasons, the Court grants Defendants' summary judgment motion [97] as to Counts VI, VII, and VIII.

## I.   Background[1]

### A.   Factual Background

The Village of Thornton is an Illinois municipal corporation located in Southwestern Cook County with a population of approximately 2,400. The Village is organized under the Illinois Municipal Code, 65 ILCS 5, and has six elected trustees and one elected village president. At all times relevant to this action, the Village president was Jack Swan.[2] The Village has a paid-on-call volunteer fire department which consists of one full-time fire chief who is

---

[1] The following does not include any fact that was unsupported by the record or that would not comply with the Federal Rules of Evidence. See *Mihalovits v. Village of Crestwood*, 2003 WL 1745513, at *1 (N.D. Ill. March 31, 2003); *Domka v. Portage County, Wis.*, 523 F.3d 776, 782 (7th Cir. 2008) (stating that evidence presented in support of or opposition to summary judgment can be considered to the extent that it is admissible under the Federal Rules of Evidence).

[2] While serving as Village president, Jack Swan also served as a paid on-call member of the Village fire department.

appointed, pursuant to Village ordinances, by recommendation of the Village president with the Village Board of Trustees' advice and consent. Def. Ex. 5.

For many years, the Village maintained a fire cadet program. Through that program, high school students ages fourteen through eighteen were eligible, with the approval of their parents, to receive training and to participate in certain activities of firefighting.[3] After turning eighteen, cadets would be eligible to serve as full-time volunteer firefighters. Defendant J.K. was a cadet in the fire cadet program and then served as a paid-on-call firefighter for the Village from August 1989 until July 1991.

Defendant J.K. served as an auxiliary police officer for the Village from February 1994 until his resignation in December 1997.[4] Upon his resignation, J.K. disclosed to police chief Peter Belos that he had a cocaine addiction for which he had entered and completed a program of rehabilitation. Def. Ex 36. at 32-36. Belos testified that right after J.K. resigned, Belos met with the Village manager, Jim Marino, and Village trustee Edward Baumgart, the trustee in charge of the police department, and notified them of J.K.'s resignation and reasons behind it. *Id*. Belos also advised Village president Jack Swan of J.K's cocaine addition and the fact that J.K. had lied to obtain a leave of absence to attend rehab and expressed his desire to file charges against J.K. *Id*. at 36. The parties dispute Swan's response, but it is clear from the record that J.K. was never fired or prosecuted by the Village; rather, he resigned and moved on to the Village fire department. *Id*. at 42.

---

[3] The minimum age requirement was originally sixteen, however, Defendant J.K. lowered the minimum age from sixteen to fourteen when he became fire chief.

[4] The parties dispute whether J.K. was ever promoted to a full-time officer. Defendants argue that he was never promoted from an auxiliary position to a full-time position; however, Plaintiff contends that J.K. was promoted to a full-time officer on November 30, 1997, without having been administered a drug test as required by the Village's standard operating procedures.

In February 1998, then-acting fire chief, Mike McCrary,[5] recommended to Village president Swan that J.K. be hired as a paid-on-call firefighter. J.K. was hired and rose to the rank of captain in June 1998. In September 1998, J.K. was appointed fire chief administrator. In early 1999, Jim Swan, son of Village president Jack Swan, recommended to his father that J.K. be appointed fire chief.[6] In April 1999, the Village merged the position of fire chief administrator and fire chief into the single, full-time position of fire chief, and J.K. was the first person to hold that position. Def. Ex. 26 at 49-51. J.K. served as fire chief until his arrest on July 18, 2002. At the time J.K. became fire chief, the Village had in place policies prohibiting sexual misconduct and mandating a drug free work place.

Defendant J.K. testified that during his tenure as fire chief, he discovered various inefficiencies and irregularities in the way the fire department was run. Def. Ex. 25 at 76-78. He claims that he removed some individuals from their positions within the fire department because of "illegal" activity. *Id*. However, the individuals whom J.K. terminated testified that the tensions within the department arose from J.K.'s treatment, demotion, prosecution, and termination of individuals who raised concerns regarding J.K.'s inappropriate sexual conduct with minor cadets. Pl. Ex. 2 at 23, 30-31; Pl. Ex. 3 at 6. James Bruinsma stated that he joined the fire department in the fall of 1999 due to concerns that his son was involved in narcotics and inappropriate sexual conduct with J.K. Pl. Ex. 2 at 23, 30-31. Bruinsma was terminated in or around April 2000 by J.K. due to unsubstantiated charges of "insubordination." *Id*. at 30. Bruinsma testified that when he was terminated, he told J.K., "I don't want you to touch my son again and I don't want my son ever to be in your presence alone. I don't want my son at your

---

[5] McCreary had served alongside J.K. as a cadet in the fire cadet program.

[6] Jim Swan has known J.K. since 1976, when they lived in the same neighborhood and were both part of the Village fire cadet program.

4

house and I don't want you giving him another ounce of alcohol." *Id*. at 31. Another member of the fire department, Wayne Braley, gave a statement to police in May 2002 that he witnessed J.K. involved in sexual activity with Bruinsma's son during a bachelor party. Pl. Ex. 4. In February 1999, Braley was suspended from the department by J.K. due to allegations that Braley was having inappropriate conduct with an underage female. Braley was later reinstated when the allegations proved to be unfounded. Pl. Ex. 3 at 66.

While serving as a police officer and later as fire chief administrator and fire chief, various rumors circulated about J.K.'s former drug addition and alleged sexual activity with male cadets. Several cadets also testified to being teased in a sexual manner in which they had not been teased prior to J.K. becoming fire chief. On July 21, 1997, while J.K. was still an auxiliary police officer for the Village, two citizens met with police chief Belos. Def. Ex 36. at 11. During the meeting, the two citizens advised the chief that their minor son was involved in narcotic and sexual activity with J.K. *Id*. at 12. The parents refused to press charges or make their son available to talk. *Id*. Belos advised Village president Jack Swan of the complaint but the parties dispute what action, if any, was taken by the Village president. Although Swan was aware of drug allegations and had a conversation with J.K. regarding his resignation from police duty as a result of that drug use (Def. Ex. 26 at 70-71), Swan testified that prior to J.K's arrest for sexual assault in July 2002, he was unaware of any sexual misconduct between J.K. and minor fire cadets from the Village of Thornton (*Id*. at 94-95).

During J.K.'s tenure as fire chief, he also owned and operated at least two private businesses – Quality Mobile Power Wash in South Holland, Illinois, and "MBR," both car washes. J.K. retained a number of part-time employees for his private businesses, including Plaintiff and other fire cadets. In addition to supervising cadets at the fire station and at his

5

private businesses, J.K. would also have parties at his house where alcohol was available and which were attended by members of the fire department, including minor cadets.

Plaintiff was born in March of 1985. He applied for admission to the fire cadet program at the age of fourteen, in or around 1999, and ended his involvement with the program in early 2003. During the time that he was involved with the cadet program, Plaintiff also worked with J.K. at his car washes. Plaintiff testified that in the fall of 2001, J.K. asked him if he could "blow him off," to which Plaintiff responded, "I don't know." Pl. Ex. 8 at 48-49. In November or December 2001, on a night in which Plaintiff planned to sleep at the fire station, Defendant J.K. asked Plaintiff to leave the fire house and accompany him to pick up an ambulance. *Id*. at 50-53. According to Plaintiff, J.K. then drove him, in his village-issued vehicle, to J.K's house where J.K. took off Plaintiff's pants and performed oral sex on Plaintiff in exchange for either $250 or $300. *Id*. at 52, 94. Plaintiff testified that he told J.K. to stop and pushed him away, but that J.K. did not stop. *Id*. at 52. According to Plaintiff, although J.K. asked Plaintiff on one more occasion if J.K. could perform oral sex on Plaintiff, the 2001 incident was the only sexual contact between Plaintiff and J.K. *Id*.

While he was fire chief, J.K. also had a sexual relationship with James Bruinsma son, E.B., when E.B. was a seventeen year-old cadet. E.B. testified that he and J.K. had sexual contact at a bachelor party in a bar (although the extent of that contact is disputed), in J.K.'s village-issued vehicle, and in a hotel room in Indianapolis during a firefighter's convention. Pl. Ex. 12 at 67-69, 76-88; Pl. Ex. 13, at 21-25; Pl. Ex. 4. He never discussed his involvement with J.K. with any official from the Village while he was a member of the fire department, either as a cadet or probationary firefighter. Def. Ex. 28 at 139. The first time that he discussed his relationship with J.K. was with police chief Arnold approximately one month prior to J.K.'s arrest. *Id*.

Louis Dal Santo was a trustee for the Village from 1995 until 2003. As a trustee, Dal Santo sat in on the executive session when Village president Swan presented J.K. for consideration as fire chief and also was involved in a discussion concerning J.K.'s prior position as a police officer for the Village. Dal Santo testified that he recalled an anonymous letter that made character and drug accusations (none of which were of a sexual nature) against J.K. while he was fire chief administrator. Pl. Ex. 37 at 63-67. According to the deposition testimony of James Bruinsma, Dal Santo also was present at his departure meeting when Bruinsma ordered J.K. to stay away from his son. Pl. Ex. 2 at 31. And, according to the deposition testimony of Brian Smith, another Village firefighter, Smith also told Dal Santo about Bruinsma's concern that something inappropriate was going on between his son and J.K. Pl. Ex. 14 at 54-59. Smith testified that he told Dal Santo about the "speculation" that J.K. might be acting inappropriately with the minor cadets. *Id*.

Sometime in early 2000, former police chief Philip Arnold met with Bruinsma and Brian Smith. Bruinsma expressed concern that his son had been spending a lot of time with J.K. and that, because of J.K.'s reputation, drugs might be involved. Def. Ex. 35 at 33-38, 59, 65-66. Arnold wanted to speak with Bruinsma's son and told Bruinsma that without his son's cooperation, nothing could be done. Def. Ex. 29 at 66-70. Although Bruinsma expressed his concerns to Arnold, a formal investigation concerning J.K.'s activities did not occur until approximately May or June 2002, after a psychologist (who had interviewed a Village cadet) advised Arnold that he should look into matters pertaining to the fire department and, specifically, J.K.'s involvement with minor cadets. After J.K.'s arrest, Arnold took written statements from J.K. wherein J.K. admitted to having a sexual relationship with Plaintiff and Bruinsma's son while both were cadets.

7

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

### B. Plaintiff's Section 1983 Claim (Count VI)

Plaintiff has sued Defendants for deprivation, under color of state law, of his liberty interest in bodily integrity as guaranteed by substantive due process under the Fourteenth Amendment to the United States Constitution. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress * * * *

42 U.S.C. § 1983. Section 1983 "creates a federal cause of action for 'the deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States.'" *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997) (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994)). "Section 1983 is not itself a source of substantive rights; instead it is a means for vindicating federal rights conferred elsewhere." *Id*. To state a claim under section 1983, a plaintiff must show (1) an action taken under color of state law, and (2) a deprivation of a right protected by the Constitution. See *Brown v. City of Lake Geneva*, 919 F.2d 1299, 1301 (7th Cir. 1990).

While Defendants argue that Count VI fails because Plaintiff cannot establish that J.K. acted under color of state law, the Court finds that Count VI fails because it is duplicative of Plaintiff's *Monell* allegations in Count VII. Both Counts VI and VII are brought pursuant to Section 1983 and are brought against the Village and the Fire and Police Board. Although Defendants approach Count VI as if it alleges a Section 1983 claim against J.K. in his individual capacity (see Def. Mem. at 4 ("In order to establish his claim against J.K. under § 1983, Doe must * * *")), the allegations in Count VI clearly are directed at the Village and the Fire and Police Board. See *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 724 (3rd Cir. 1989)

("It is immaterial * * * whether Wright's sexual abuse is viewed as attributable to the state. This consideration would be relevant had Stoneking sued Wright under Section 1983, alleging that he acted under color of state law. She did not. Instead, the suit is against the School District and its supervisory officials, and they were incontestably acting under color of state law.").[7] It is well accepted that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978). Accordingly, a municipality can only be held liable under Section 1983 if a custom or policy of the municipality was a cause of the plaintiff's injury. *Latuszkin,* 250 F.3d at 504-05. Therefore, Plaintiff's allegations against the Village and Fire and Police Board can only support his *Monell* claim (Count VII) and not a separate Section 1983 action (Count VI) against the Village and Fire and Police Board.

### C. *Monell* Claim (Count VII)

In order to state a Section 1983 claim against a municipality, the complaint must allege that an official policy or custom not only caused the constitutional violation, but was "the moving force" behind it. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389 (1989); see also *Arlotta v. Bradley Center,* 349 F.3d 517, 521-22 (7th Cir. 2003); *Gable v. City of Chicago,* 296

---

[7] The Court finds the absence of a Section 1983 claim against Defendant J.K. to be somewhat puzzling, particularly in view of the facts that (i) the parties' briefs appear to address matters that would be relevant to such a claim and (ii) in the final paragraph of Count VI of his third amended complaint, Plaintiff prays for judgment against all Defendants, including J.K., individually and as an agent of V. of T. However, the Court has undertaken a detailed examination of Counts VI and VII and finds no basis for reading those counts as pleading a Section 1983 claim against J.K. in his individual capacity. To begin with, the captions of Count VI and Count VII plainly state that those counts are against the Village and the Fire and Police Board, and the allegations set forth in the numerous paragraphs are consistent with a claim for municipal liability. The answer of the Village and the Fire and Police Board similarly treats Counts VI and VII as having asserted claims only against the municipal defendants and not J.K. Parenthetically, the Court notes that Counts VI and VII of the third amended complaint largely mirror Counts XV and XVI of Plaintiff's original complaint, as to which the judge previously assigned to this case commented: "While [P]laintiff has brought two claims (15 and 16) against the defendants under [42] U.S.C. § 1983, the court cannot make out a difference between the two * * *." Finally, and perhaps most notably, Count VI is devoid of any allegation that Defendant J.K. acted under color of state law, which would seem to be a necessary predicate for placing J.K. (and, indeed, all of the Defendants) on notice that Plaintiff sought Section 1983 relief against J.K. in his individual capacity. The Court is unwilling to read an individual capacity claim against J.K. into the current complaint when Plaintiff has failed to properly allege such a claim.

F.3d 531, 537 (7th Cir. 2002). Unless there is an unconstitutional policy, there cannot be official capacity liability; only individual-capacity liability is possible. The "official policy" requirement for liability under Section 1983 is to "distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479 (1986). "Misbehaving employees are responsible for their own conduct[;] 'units of local government are responsible only for their policies rather than misconduct by their workers.'" *Lewis v. City of Chicago,* 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Fairley v. Fermaint,* 482 F.3d 897, 904 (7th Cir.2007)). To establish a custom or policy, a plaintiff must show that his constitutional injury was caused "by (1) the enforcement of an express policy of the City, (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Latuszkin,* 250 F.3d at 504.

Plaintiff has not pointed to an express policy of the City nor has he alleged "a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law." Plaintiff briefly asserts in his response that "Defendants maintained a policy of inadequate procedures regarding the investigation of complains [sic] of sexual abuse by Village officers, such that summary judgment is not proper with respect to Plaintiff's claim of municipal liability." See Pl. Resp. at 11. However, Plaintiff's evidence is limited to J.K.'s actions and the Village's response to rumors regarding J.K.; Plaintiff has not pointed to any other instances of the Village turning a blind eye to the alleged improprieties of other employees or failing to investigate citizen's complaints. The evidence in this case – which focuses solely on the Village's response to the actions of one employee – is far too sparse to establish "a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law." See *Montano v. City of Chicago*, 535 F.3d 558, 570-71 (7th Cir. 2008).

Instead, Plaintiff appears to be relying on the third potential avenue for establishing *Monell* liability – that his constitutional injury was caused by a final policymaker. He maintains that J.K., as fire chief, was a final policymaker and thus his assault on Plaintiff gives rise to liability against the Village. Alternatively, he contends that either Village president Jack Swan, trustee Louis Dal Santo, or Philip Arnold or Peter Belos (former Village police chiefs) were aware of a significant risk that Plaintiff would be assaulted, were deliberately indifferent to that risk, and that the deliberate indifference of any one of them, as a final policymaker, is the basis for imposing liability against the Village.

The Supreme Court has charged the trial judge with identifying "those officials or governmental bodies who speak with final policymaking authority for the local government actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989). Whether a particular official has final policymaking authority is a question of state law. See *Duda v. Board of Ed. of Franklin Park Public Sch. Dist. 84*, 133 F.3d 1054, 1061 (7th Cir. 1998). The determination of the actual function of a municipal official is "dependent on the definition of the official's functions under relevant state law." *Id.* Simply because an official may have discretion to act or "authority to make administratively final decisions" does not make that individual a final policymaker for purposes of *Monell* liability. *Radic v. Chicago Transit Authority*, 73 F.3d 159, 161 (7th Cir. 1996).

"In order to have final policymaking authority, an official must possess '[r]esponsibility for making law or setting policy,' that is, 'authority to adopt rules for the conduct of government.'" See *Rasche v. Village of Beecher*, 336 F.3d 588, 599 (7th Cir. 2003) (quoting *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992)). Under Illinois' statutory scheme, a city's board of trustees (or city council) is considered the policymaking authority. See *Rasche*, 336

F.3d at 600-01. The board of trustees consists of the trustees as well as the president and has the authority to "pass ordinances, resolutions, and motions * * *."[8] 65 ILCS 5/3.1-45-5. A village president shall "perform all duties which are prescribed by law, including ordinances, and shall take care that the laws and ordinances are faithfully executed." 65 ILCS 5/3.1-35-5. Generally, a person holding only executive power – like a village president – does not have policymaking authority for purposes of Section 1983; rather, the policymaking authority rests within the legislative powers of the board of trustees. See *Rasche*, 336 F.3d at 601.

Plaintiff has failed to present evidence that final policymaking authority had been delegated by the Village Board of Trustees to a single trustee, the fire chief, the Village president, or the chiefs of police. In fact, Plaintiff has not presented any argument as to which individuals in the Village possess final policymaking authority. Instead, Plaintiff focuses his argument on the "deliberate indifference" of the various officials to the hiring, retention, or termination of a fire chief with a history of drug use and about whom rumors of sexual misconduct had circulated. But what these various officials did or did not do can constitute liability under *Monell* only if those officials had final policymaking authority. Clearly, J.K. was not responsible for his own hiring, retention, or termination. Nor has Plaintiff put forth any evidence that the Fire and Police Board have anything to do with his employment.[9] Instead, it is clear from the deposition testimony of various individuals as well as the Village's ordinances that the fire chief is appointed by president, but only if the Board of Trustees consents. Thus, it is the Board of Trustees, collectively, that has final policymaking authority for *Monell* purposes.

---

[8] In the Village of Thornton, the president votes only to break ties among the six trustees.

[9] Based on the record of admissible evidence before the Court, Plaintiff has not submitted sufficient evidence or arguments regarding the Fire and Police Board. Rather, it appears as if Plaintiff uses the Fire and Police Board interchangeably with the Village's Board of Trustees. In addition to the lack of evidence about the Fire and Police Board (including who is on it, what it does, how it functions, etc.), based on the evidence submitted by Defendants and the record as a whole, its clear that the focus should be on the Board of Trustees and what it knew or, perhaps more tellingly, did not know.

13

There is no evidence that any issue relating to J.K.'s alleged sexual misconduct with minors was ever brought to the attention of the Board of Trustees collectively – for example, at a regular Board of Trustees meeting or in a letter to the Board that was reviewed at a meeting. If there were such evidence, Plaintiff would have a much stronger claim under his "final policymaker" theory of municipal liability. Instead, Plaintiff must try to show that the one trustee and the other Village officials who are alleged to have possessed relevant information had some obligation to pass that information on to the Board of Trustees and that the Board of Trustees either failed to investigate and uncover J.K.'s wrongdoing or actually condoned (or "ratified") J.K.'s actions.

Under the "final policymaker" theory of liability, "a municipality may also be liable for the actions of an employee who lacks final policymaking authority if that employee's actions were 'ratified' by the municipality." *Killinger v. Johnson,* 389 F.3d 765, 772 (7th Cir. 2004) (citing *Baskin v. City of Des Plaines,* 138 F.3d 701, 705 (7th Cir. 1998)). To state a claim under this theory, a plaintiff "'must allege that a municipal official with final policymaking authority approved the subordinate's decision and the basis for it.'" *Id.* (citing *Baskin v. City of Des Plaines,* 138 F.3d 701, 705 (7th Cir.1998)).

Here, Plaintiff attempts to show that the Village "approved" of J.K.'s actions through the Village's inaction – essentially by failing to investigate or terminate him. In regard to such a claim, the Seventh Circuit has held that "a plaintiff cannot establish a § 1983 claim against a municipality by simply alleging that the municipality failed to investigate an incident or to take punitive action against the alleged wrongdoer." *Baskin,* 138 F.3d at 705; see also *Wilson v. City of Chicago,* 6 F.3d 1233, 1240 (7th Cir. 1993). Rather, "[d]eliberate or reckless indifference to complaints must be proved in order to establish that an abusive practice has actually been condoned and therefore can be said to have been adopted by those responsible for making

municipal policy[;]" the mere failure to eliminate a practice does not constitute an approval of the practice. *Id*.

In order for Plaintiff to show that the alleged customs were attributable to the Village and thus had the force of law, he must show that Village policymakers were "deliberately indifferent as to known or obvious consequences." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 406-07 (1997). The Supreme Court has defined deliberated indifference in this context to mean that "a reasonable policymaker [would] conclude that the plainly obvious consequences" of the City's actions would result in the deprivation of a federally protected right. *Id*. at 411. The Seventh Circuit has stated that a finding of deliberate indifference requires a showing that policymakers "were aware of a substantial risk" of a constitutional violation and "failed to take appropriate steps to protect [plaintiff] from a known danger." *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000).

Plaintiff argues that Village president Swan, trustee Dal Santo, or police chiefs Belos and Arnold knew or should have known that J.K. was sexually abusing minors or at least was a risk to do so. In an effort to establish that the Village president was deliberately indifferent to a risk of injury, Plaintiff highlights a conversation in July 1997 between Peter Belos (at the time the chief of police) and Swan in which Belos told Swan that anonymous parents had accused J.K. of having a sexual relationship with their son. However, the parents refused to identify themselves or their son and stated that they did not want any action taken. Swan responded that he had known J.K. all his life and did not believe the accusations. Belos testified that he kept an eye on J.K. and also pressed the parents of the unknown boy to give him additional information. Plaintiff also points out that Swan was aware of allegations about J.K. using drugs and had a conversation with J.K. regarding his resignation from police duty as a result of that drug use. However, Swan testified that prior to J.K's arrest for sexual assault in July 2002, he was unaware

15

of any sexual misconduct between J.K. and Village of Thornton fire cadets. Finally, Plaintiff argues that trustee Dal Santo was aware of the rumors about J.K. and should have taken steps to have him terminated.

Despite the grievous circumstances surrounding the issues in this case, the facts that have been established do not demonstrate that any action or inaction by Swan, the police chiefs, or the Village Board of Trustees rose to the level of deliberate or reckless indifference as is required for municipal liability. To the extent that Plaintiff seeks to impose liability on the Village for its decision to hire J.K., there is insufficient evidence to charge the Board of Trustees or the Village president with knowledge of any prior sexual misconduct by J.K. at the time he was hired as fire chief. Perhaps it could be said that Village officials and policymakers did not act prudently when they had clear notice of J.K.'s drug problems or when they received information (albeit anonymously) about J.K.'s then-alleged (now admitted) sexual impropriety. But the standard for imposing municipal liability is not what a reasonably prudent person would do in the circumstances. It is a much more stringent standard, requiring that policymakers behave in a manner that is "deliberately indifferent as to known or obvious consequences." *Brown*, 520 U.S. at 406-07. It is not obvious that a person with a drug problem will engage in sexual misconduct with minors. Nor was it an act of "deliberate indifference" not to have reported to the full Board of Trustees the rumors and unverifiable reports of sexual misconduct by J.K. that some Village officials received.

The main problem with Plaintiff's argument against the municipality is that the evidence submitted does not demonstrate that the individuals with policy-making authority had concrete, personal knowledge of wrongdoing. "[A]lthough personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation or other first-hand personal experience. They must not be * * * speculations, hunches, intuitions, or rumors about matters

16

remote from that experience.'" *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (quoting *Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991)). Plaintiff's argument that the Village knew or should have known what J.K. was doing is based on speculation and rumors. To be sure, if the extent of the officials' knowledge had been greater – either in quality or quantity – there might have been a fact question as to "deliberate or reckless indifference to complaints" or "aware[ness] of a substantial risk" that could have given rise to a triable claim. *Frake*, 210 F.3d at 782. But the facts as they have been adduced at the summary judgment stage do not permit such a conclusion here as to the municipal defendants.

At the same time, the Court hastens to add that entry of summary judgment on Plaintiff's attempt to impose municipal liability under Counts VI and VII by no means leaves Plaintiff without a possible remedy against J.K. himself for his alleged wrongdoing. As the Seventh Circuit has stressed, "[m]isbehaving employees are responsible for their own conduct," while "units of local government are responsible only for their policies rather than misconduct by their workers." *Lewis*, 496 F.3d at 656.

### C. Civil Conspiracy Pursuant to § 1983

Defendants also have moved for summary judgment on Plaintiff's Section 1983 conspiracy claim, arguing that Plaintiff has insufficient evidence to establish a conspiracy. However, even before reaching the typical elements of the conspiracy claim – such as whether there was an express or implied agreement among Defendants to deprive Plaintiff of his constitutional rights and whether Defendants committed overt acts in furtherance of any agreement – the Court considers decisions in the Seventh Circuit and this district that indicate that the Court need not reach those elements in the circumstances of this case. The Seventh Circuit recently has explained that "'[t]o establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and *private individuals(s)* reached an

understanding to deprive the plaintiff of his constitutional rights; and (2) those individual(s) were willful participant[s] in joint activity with the State or its agent.'" *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007) (emphasis added) (quoting *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003)); see also *Wright v. Village of Franklin Park*, 2008 WL 820560, at *28 (N.D. Ill. June 8, 2007) (granting summary judgment in favor of defendants on Section 1983 conspiracy claim based on plaintiff's failure to allege that private individuals were involved in the conspiracy); *Thayer v. Chiczewski,* 2007 WL 3447931, at *5 (N.D. Ill. Nov. 13, 2007) (dismissing § 1983 conspiracy claim for failure to allege that private individuals were involved in the conspiracy). Plaintiff has failed to offer any evidence that any of the Defendants sued in Count VIII – the Village, J.K., Village president Swan, and the Fire and Police Board – were private individuals, rather than state actors at the time of the events at issue. Under the decisions cited above, that omission is fatal to any civil conspiracy claim.

In any event, even beyond that apparently fatal flaw, the Court concludes that Plaintiff has failed to demonstrate that Defendants "reached an understanding" to deprive Plaintiff of his constitutional rights. See *Reynolds*, 488 F.3d at 764; *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988); *Thurman v. Village of Hazel Crest*, 2008 WL 3249523, at *7 (N.D. Ill. Aug. 6, 2008). To sustain a claim that defendants conspired to deny a plaintiff's constitutional rights, a plaintiff must allege that defendants "directed themselves toward an unconstitutional action by virtue of a mutual understanding[,]" and support such allegations with facts suggesting a "meeting of the minds." *Amundsen v. Chicago Park Dist.,* 218 F.3d 712, 718 (7th Cir. 2000). A conspiracy claim cannot survive summary judgment based on vague conclusory allegations that include no overt acts reasonably related to promoting the conspiracy. *Id.*

At the onset, the Court notes the inconsistency of Plaintiff's position with respect to his municipal liability and his conspiracy claims. In arguing that municipal liability exists, Plaintiff

contends that a final policymaker was aware of the obvious risk to Plaintiff that J.K. could harm him. However, in arguing his conspiracy claim, Plaintiff argues that anything the police chiefs or the Village president knew should have been brought to the attention of the Board of Trustees, and a conspiracy can be inferred from the fact that it was not. Beyond this incongruity, in order to sustain a Section 1983 conspiracy claim, "there must be some evidence of some concerted effort or plan between the [conspiring parties]." *Moore v. Marketplace Restaurant, Inc*., 754 F.2d 1336, 1352-53 (7th Cir. 1985). Upon examination of the parties' briefs and supporting evidence, the Court finds no evidence to support the theory that a customary plan existed between Defendants to conspire to violate Plaintiff's rights. That the alleged prior misconduct may not have been brought to the attention of the Board of Trustees is insufficient to establish that there existed any agreement between the former chiefs of police and Village president Swan to conceal the information.

## III. Conclusion

For the foregoing reasons, the Court grants Defendants' summary judgment motion [97] as to Counts VI, VII, and VIII of Plaintiff's third amended complaint. In addition, because that disposition results in the dismissal of all claims over which the Court has original jurisdiction (see 28 U.S.C. § 1367(c)(3)), the Court must address whether to retain jurisdiction over Plaintiff's state law claims. As the Seventh Circuit consistently has stated, "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *Alonzi v. Budget Constr. Co.*, 55 F.3d 331, 334 (7th Cir. 1995); *Brazinski v. Amoco Petroleum Additivies Co.*, 6 F.3d 1176, 1182 (7th Cir.

1993). Finding no justification to depart from that "usual practice" in this case,[10] the Court dismisses *without prejudice* the state law claims asserted in Counts I through V of Plaintiff's third amended complaint.

Dated: September 30, 2008

_____
Robert M. Dow, Jr.
United States District Judge

---

[10] In *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251-53 (7th Cir. 1994), the Seventh Circuit noted that there occasionally are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point to a federal decision of the state-law claims on the merits." The first example that the Court discussed occurs "when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court." *Id*. at 1251. That concern is not present here, however, because Illinois law gives Plaintiff one year from the dismissal on jurisdictional grounds of state law claims in federal court in which to refile those claims in state court. See 735 ILCS 5/13-217; *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008). Dismissal without prejudice also is appropriate here because substantial judicial resources have not been committed to the state law counts of Plaintiff's third amended complaint (*Wright*, 29 F.3d at 1251) – indeed, J.K. has not been involved in the briefing on the summary judgment motion, nor have any of the counts against him been raised in that briefing. Finally, this is not a circumstance in which "it is absolutely clear how the pendent claims can be decided." *Id*.

20